UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROSS FELDSHER<br><br>                        Plaintiff<br><br>     v.<br><br>MICHAEL MAKOWENSKYJ a/k/a MICHAEL MAK,<br>PARLOR GAMES, LLC,<br>CHRISTOPHER LAZOS,<br>OPPENHEIMER & Co. INC.,<br>BOOM CUPS HOLDINGS, LLC,<br>TEAM BOOM CUPS, LLC,<br>MAK BOOM CUPS, LLC,<br>1800 LIQUORS HOLDING GROUP, LLC,<br>CELEBRITY SPORTS ENTERTAINMENT, LLC,<br>MAK 1800 LIQUORS, LLC and<br>ANAMAE MERCHANTS, LLC,<br><br>                       Defendants. | **COMPLAINT**<br><br>23-cv-09191<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Ross Feldsher ("Plaintiff") by his attorneys Forchelli, Deegan, Terrana, LLP, as and for his Complaint against Michael Makowenskyj a/k/a Michael Mak, Parlor Games, Christopher Lazos, Oppenheimer & Co. Inc., Boom Cups Holding, LLC, Team Boom Cups, LLC, Make Boom Cups, LLC, 1800 Liquors Holding Group, LLC Make 1800 Liquors and Anamae Merchants, LLC, alleges as follows:

**INTRODUCTION**

1.  Defendant Michael Makowenskyj a/k/a Michael Mak ("Mak") is a former Suffolk County Police Officer and purported business entrepreneur who founded Defendants Parlor Games, LLC ("Parlor Games"), Boom Cups Holding, LLC, ("BCH"), Team Boom Cups, LLC

1

("Boom Cups"), Mak Boom Cups, LLC ("MBC"), 1-800 Liquors Holding Group, LLC ("LHG"), Mak 1800 Liquors, LLC ("Mak 1-800", collectively with LHG, "1-800 Liquors"), Celebrity Sports Entertainment, LLC ("CSE"), and Anamae Merchants, LLC ("Anamae", collectively with the corporate defendants, the "Mak Entities." The Mak Entities together with Mak, will hereafter be referred to as the "Mak Defendants").

2. Publicly, the Mak Defendants give the appearance of legitimate viable business ventures that Mak operates to solicit investments in unregistered securities and loans from Plaintiff and other investors.

3. To this end, Mak represented to Plaintiff that celebrities such as Shark Tank's Kevin Harrington and boxer Floyd Mayweather are "special advisors" to the Mak Entities. Furthermore, the Mak Defendants promoted and solicited investments by using sham and inflated business valuations as determined by Defendant Christopher Lazos ("Lazos"), a registered representative with Defendant Oppenheimer & Co. Inc. ("Oppenheimer") and chief financial officer of defendant Parlor Games.

4. Additionally, the Mak Defendants host extravagant events throughout the country that attract famous celebrities, professional athletes and musicians.

5. In reality, the Mak Defendants are heavily indebted and engaging in a Ponzi-like scheme for their own financial gain.

6. On information and belief, since 2017, the Mak Defendants defaulted on over $1 million that they were obligated to repay individuals and businesses. The Mak Defendants fail to disclose any of this when soliciting investors like Plaintiff. To the contrary, the Mak Defendants falsely represented to Plaintiff that his investment would bare zero risk.

7. Additionally, the Mak Defendants deliberately concealed their financial condition, misrepresented the intended purpose of the investor funds, and provided a false and misleading company business valuation while soliciting Plaintiff's investment.

## PARTIES

8. Defendant **MICHAEL MAKOWENSKYJ a/k/a MICHAEL MAK** ("Mak") is an individual residing in the State of New York at 1723 Park Avenue, New Hyde Park, New York 11040 and, upon information and belief, is a principal of Makowenskyj Entities and/or Contracting Entities.

9. Upon information and belief, **PARLOR GAMES, LLC** ("Parlor Games") is a domestic limited liability company organized and existing under the laws of the State of New York with its principal place of business and address for service of process located at 1722 Park Avenue, New Hyde Park, New York 11040.

10. Defendant **CHRISTOPHER LAZOS** ("Lazos") is an individual residing in the State of New York. Lazos is a registered representative of Oppenheimer and, upon information and belief, is the chief financial officer and part owner of Parlor Games.

11. Defendant **OPPENHEIMER & CO. INC**. is a New York full-service brokerage and investment bank with a main address at 85 Broad Street 22nd, 24th Floor New York, New York 10004.

12. Upon information and belief, **BOOM CUPS HOLDING LLC** ("BCH") is a domestic limited liability company organized and existing under the laws of the State of New York with its principal place of business and address for service of process located at 390 North Broadway, Suite 200, Jericho, New York 11753.

3

13. Upon information and belief, **TEAM BOOM CUPS LLC** ("Boom Cups") is a domestic limited liability company organized and existing under the laws of the State of New York with its principal place of business and address for service of process located at 390 North Broadway, Suite 200, Jericho, New York 11753.

14. Upon information and belief, **MAK BOOM CUPS LLC** ("MBC") is a domestic limited liability company organized and existing under the laws of the State of New York with its principal place of business and address for service of process located at 390 North Broadway, Suite 200, Jericho, New York 11753.

15. Upon information and belief, **CELEBRITY SPORTS ENTERTAINMENT LLC** ("CSE") is a domestic limited liability company organized and existing under the laws of the State of New York with its principal place of business and address for service of process located at 1722 Park Avenue, New Hyde Park, New York 11040.

16. Upon information and belief, **ANAMAE MERCHANTS LLC** ("Anamae") is a domestic limited liability company organized and existing under the laws of the State of New York with its principal place of business in Nassau County and its address for service of process located at 2804 Gateway Oaks Drive, #100, Sacramento, California 95833.

17. Upon information and belief, **1800 Liquors Holding Group LLC** ("LHG") is a domestic limited liability company organized and existing under the laws of the State of New York with its principal place of business and address for service of process located at 390 North Broadway, Suite 200, Jericho, New York 11753.

18. Upon information and belief, **MAK 1800 Liquors LLC** ("Mak 1800") is a domestic limited liability company organized and existing under the laws of the State of New York

4

with its principal place of business and address for service of process located at 390 North Broadway, Suite 200, Jericho, New York 11753.

## JURISDICTION AND VENUE

19.  This is a civil action arising under Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b); under Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240-10b-5; and under applicable principles of contract and common law.

20.  This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337(a); under Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and under principles of supplemental jurisdiction because Plaintiff's state claims form part of the same case or controversy.

21.  This Court has personal jurisdiction over all Defendants, who have substantial connections to this state based on their numerous general and specific contacts to New York.

22.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and 15 U.S.C. § 78aa(a) because it is the judicial district in which the Defendants are subject to personal jurisdiction at the time of commencement of this action, because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district, and because the Defendants reside and/or transact business in this district.

## FACTS

23.  In August 2021, Plaintiff's trusted friend, Margarita Sabel ("Sabel"), approached Plaintiff to introduce him to Mak and investing in the Mak Entities.

24. Ms. Sabel assisted the Mak Defendants in finding and soliciting protentional investors. In exchange for her efforts, Ms. Sabel received a commission resulting from investments made into the Mak Entities. This included, receiving a commission stemming from Plaintiff's $250,000 investment in Parlor Games.

25. Upon information and belief, Sabel is not a registered broker, financial advisor, or affiliated with a registered broker-dealer.

26. Following Sabel's introduction of Plaintiff to Mak, Mak began promoting and soliciting Plaintiff to purchase securities in Parlor Games. Parlor Games is purported to be a start-up mobile gaming app that Mak founded in January, 2021.

27. On or about August 27, 2021, Mak emailed Plaintiff copy of Parlor Games' "Investor Deck".

28. Through the Investor Deck, Mak represented Parlor Games had a company valuation of $10 million and sought a $1.5 million dollar capital raise from investors.

29. Additionally, the Investor Deck represented the use of investor funds would be allocated as follows:

    i. Development: $750,000
   ii. Operations & Advisory: $300,000
  iii. Legal & Accounting: $200,000
  iv. Marketing $250,000

30. The Investor Deck also represented an anticipated timeline which included a marketing campaign and a "Series A" capital raise to occur in February 2022.

31. In the same email containing the Investor Deck, Mak represented to Plaintiff that "[a]ll monies will be personally guaranteed by the note maker **at no risk to the note holder** and backed by a life insurance policy…". (emphasis added).

32. Mak's email also provided Plaintiff snapshot overviews of each of the Mak Entities, which included Parlor Games.

33. For example, Mak represented Parlor Games' pre-revenue current valuation was $10 million. Mak represented to the Plaintiff this valuation was determined by Defendant Christopher Lazos, an Oppenheimer financial advisor and Parlor Games' Chief Financial Officer, as well as Shark Tank's Kevin Harrington. Further, Mak represented that Parlor Games' valuation would grow between 2x-5x in just six months.

34. When describing Defendant CSE Mak represented that the company is "very unique in that it is our marketing engine to produce pennies on the dollar in marketing capabilities for our entire portfolio" and is backed by "[Mak's] friend Floyd Mayweather and many other notable celebrities and athletes".

35. When describing defendant Boom Cups, Mak claimed that the "company went on pause during the pandemic due to the lack in manufacturing capabilities and production capacity. The brand is worth a few million today, and we were already offered our first royalty deal option. We are going to keep this company on pause until 2022."

36. On or about September 1, 2021, Mak provided Plaintiff a signed single page document titled "Parlor Games Purchase Agreement", that provided, *inter alia*, :

> On September 1, 2021, "the Purchaser" issued $250,000 to "the Maker" in exchange for 2.50% equity interest of Parlor Games, the

7

company. "The Purchaser" will have the option to sell their equity in Parlor Games to "the Maker" on or before 03/01/2022.

37. Notwithstanding Mak's previous representation to Plaintiff that Boom Cups would be "kept on pause until 2022" and Mak's solicitation of Plaintiff's investment for Parlor Games, Mak directed Plaintiff's $250,000 investment to the bank account of Boom Cups.

**Plaintiff's Evasive Conduct and Failure to Repay Plaintiff's Note**

38. After successfully inducing Plaintiff to invest $250,000 in Parlor Games, Mak became evasive while communicating information to Plaintiff about his investment.

39. For example, in or around November 2021, Mak sent a message to Plaintiff to reassure him that Parlor Games is on pace for its February 2022 events as previously represented in the Investor Deck and claimed he would be providing him an investor newsletter. When Mak failed to provide the newsletter as promised, Plaintiff sent Mak a series of messages requesting an update that Mak ignored for approximately three weeks.

40. Finally, on or about January 15, 2022, Mak responded to Plaintiff by offering to fly Plaintiff from New York to Florida so he can provide Plaintiff an in-person update. In an effort to induce Plaintiff to fly to Florida, Mak claimed to be with former professional boxer Floyd Mayweather. Plaintiff declined Mak's invitation and insisted on an update.

41. From Florida, Mak then messaged Plaintiff that "everything is very good right now…tech is solid and we start the crowd funding right after Super Bowl for the next round of financing."

8

42. Mak's continued failure to communicate with Plaintiff prompted Plaintiff to request from Mak Parlor Games' most recent financials on or about January 24, 2022. Mak failed to respond to Plaintiff's request.

43. Despite Mak reassuring Plaintiff in January that "everything was good", Parlor Games failed to engage in the marketing campaign and "Series A" raise as represented in the Mak Defendants' solicitation of Plaintiff's investment.

44. On April 1, 2022, Mak responded to Plaintiff's January request for Parlor Games' financials by informing Plaintiff that he had sent an email and to schedule a call. Within minutes of receiving Mak's message, Plaintiff requested they schedule a call. Mak failed to respond to Plaintiff message.

45. Over a month later, on or about May 21, 2022, Plaintiff received a message purporting to be from Mak's assistant, Scott. Scott claimed Mak was rushed to the hospital and that Mak's team would be assisting him. Plaintiff immediately asked Scott to call him, which Scott declined.

46. On or about May 24, 2022 Mak messaged Plaintiff to schedule a meeting for a day during the week of June 13, 2022 or June 20, 2022. Mak further claimed he "will have accurate info on closing the note or possible money in possession."

47. In response, Plaintiff requested the immediate return of his investment, noting Mak's communication failures since January. Mak then messaged Plaintiff claiming he was in the process of selling Plaintiff's note for someone taking an equity position in the company, that he had private buyers coming and would have a crowd funding platform active in the next thirty days.

48. Additionally, Mak claimed his projections were "off a bit" because of "some accounting and legal obligations that the company had to meet."

49. Between June 1, 2022 and June 6, 2022, Plaintiff again messaged Mak requesting he provide a firm date that Plaintiff's funds would be returned. Mak failed to respond to any of these messages until June 7, 2022. In his response, Mak requested Plaintiff meet him in person to "clear the air."

50. Plaintiff continued to request Parlor Games' financial records which Mak failed to provide. Instead, Mak represented to Plaintiff that once Parlor Games activated its crowd funding, company financials would be provided.

51. In or around August 2022, Mak represented to Plaintiff that he would provide documents compiled by his attorney concerning Parlor Games. Nearly two weeks after the date Mak promised to provide Plaintiff with his requested information, Plaintiff once again messaged Mak to request the return of his $250,000 investment.

52. On September 7, 2022, Plaintiff again messaged Mak requesting the return of his investment, noting Mak's continued excuses and broken promises, resulting in additional delay.

53. On or about October 29, 2022, Plaintiff again messaged Mak because of Mak's continued delays, noting they have not spoken since September. Again, Plaintiff requested the return of his investment.

54. Mak scheduled a call with Plaintiff for November 23, 2022 to provide Plaintiff with updates. On November 23, Mak failed to call Plaintiff as he promised.

55. Between December 2022 and April 2023, Plaintiff repeatedly made attempts to ascertain a date Mak would return his investment. During this time, Mak would be largely unresponsive claiming to be traveling, with family or in business meetings.

56. In April 2023, Mak wired to Plaintiff $25,000 dollars after receiving a "bridge" loan. Upon information and belief, Mak relied on other investors' funds to make this payment.

57. Between April 2023 and September 2023, Mak continued to represent he would make a payment on a certain date but ultimately fail to pay the Plaintiff or to provide any sort of excuse for said failure.

58. For example, Mak represented to Plaintiff that 1-800 Liquors secured a $2.5 million dollar loan from a Mexican based company and would fully repay Plaintiff upon receipt of those funds. Mak, however, never paid Plaintiff, claiming an issue caused by the international wire transfer halted the deal.

59. To date, the Mak Defendants have refused to provide Plaintiff information concerning Parlor Games' company financials or the balance of his "zero risk investment."

### The Mak Defendants' Materially False Statements and Omissions

60. In order to induce Plaintiff's investment in Parlor Games and conceal their frequently scheme, the Mak Defendants Lazos intentionally made a series of materially false statements and omissions with the intent to defraud the Plaintiff.

61. As an initial matter, the Mak Defendants failed to disclosed *any potential risk* factors associated with Plaintiff's investment. This is including, but not limited to, risks concerning the protentional total loss of the investment and the illiquidity of the investment.

62.     The Mak Defendants and Lazos intentionally misled Plaintiff concerning Parlor Games' sham and arbitrary $10 million valuation for the purposes of inducing Plaintiff's investment. For example, Lazos and the Mak Defendants falsely represented this valuation was determined by Lazos through his employment with Oppenheimer and as Parlor's Games chief financial officer.

63.     Yet, as disclosed on Lazos's FINRA CRD, his involvement in Parlor Games is an outside business activity and unrelated to his employment with Oppenheimer. Additionally, while Lazos and the Mak Defendants represented to Plaintiff that Lazos is Parlor Games' chief financial officer, Lazos represents on his FINRA CRD that his outside involvement in Parlor Games is limited to a only a five percent ownership interest he received in exchange for spending approximately one hour a month serving on Parlor Games' Board of Directors.

64.     Lazos' FINRA CRD also claims his outside business activities involving Parlor Games is "unrelated to investments", yet Lazos as the purported chief financial officer determined Parlor Games' valuation in connection with its $1.5 million investor raise.

65.     The Mak Defendants and Lazos also knowingly used Oppenheimer's name and company logo in Parlor Games' investment material to mislead Plaintiff into believing a global investment bank was involved in determining Parlor Games' valuation.  At no point, did Lazos or the Mak Defendants disclose Oppenheimer's lack of involvement in the company valuation determination.

66.     The Mak Defendants also falsely represented that "[a]ll monies will be personally guaranteed by the note maker at no risk to the note holder", while intentionally concealing the Mak Defendants history of soliciting personal loans and subsequent defaults.

67. For instance, court records indicate that between 2017 and August 2021, Mak obtained over $400,000 in personal loans from individuals and banking institutions that he failed to repay.

68. Mak also falsely represented the use of investor funds would be for Parlor Games' development, operations & advisors, legal & accounting, and marketing. In reality, the Mak Defendants operate a Ponzi-like scheme that includes shuttling investor funds, like Plaintiff's investment, into other Mak Entities to satisfy other investor obligations, to fund the Mak Defendants' lavish celebrity events, or for Mak's own personal use.

69. For example, and upon information and belief, Mak used funds obtained from investors in other Mak Entities for the sole purpose of making a partial payment to Plaintiff in connection with his investment in Parlor Games.

70. Even after the Mak Defendants induced Plaintiff's $250,000 investment in September 2021, the Mak Defendants concealed their woeful financial condition.

71. For example, in November 2021-two months after inducing Plaintiff's investment, the Mak Defendants secured a $250,000 short term loan that required repayment by February 2022.

72. The Mak Defendants intentionally concealed this $250,000 loan obligation from Plaintiff despite his request to review Parlor Games' financials and Mak's assurances that "everything is good" with Palor Games. Mak also failed to disclose defaulting on this loan, which prompted the pending Eastern District of New York case titled *Bayev et al. v. Makowenskyj*; 22-cv-03503.

73. Desperate for cash flow to keep perpetuating the fraud, Mak also concealed that he directed several of the Mak Entities to enter into a merchant cash advance agreement (MCA Deal)

13

that required daily payments of $4,684.00 in December 2021. Further Mak concealed that he personally guaranteed performance of the MCA Deal and ultimately defaulted, rending a judgment against him and the Mak Entities in June 2022.

## FIRST CLAIM FOR RELIEF

### Violations of the Antifraud Provisions of the Exchange Act
### Exchange Act Section 10(b) and Rule 10b-5
### (against the Mak Defendants and Defendant Lazos)

74. Plaintiff incorporates by reference each and every allegation contained in paragraphs above.

75. By engaging in the conduct alleged above the Mak Defendants and Lazos, directly or indirectly, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, knowingly or with severe recklessness:

    a. employed a device, scheme, or artifice to defraud; and/or

    b. made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    c. engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

76. By reason of the foregoing, the Mak Defendants and Lazos have violated, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] that has caused Plaintiff to sustain damages.

## SECOND CLAIM FOR RELIEF

### Failure to Supervise
### (against Defendant Oppenheimer)

77. Plaintiff incorporates by reference each and every allegation contained in paragraphs above.

78. Oppenheimer is a FINRA member firm.

79. Lazos is a registered representative, FINRA member and employee of Oppenheimer.

80. FINRA Rule 3110 requires that each member firm establish and maintain a system to supervise the activities of each associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations.

81. FINRA Rule 3270 prohibits registered persons from being "an employee, independent contractor, sole proprietor, officer, director or partner of another person, or be compensated, or have the reasonable expectation of compensation, from any other person as a result of any business activity outside the scope of the relationship with his member firm, unless he has provided prior written notice to the member, in such form as specified by the member.

82. FINRA Rule 3280 required Lazos to provide Oppenheimer written notice describing in detail any private securities transaction prior to participating in any securities transaction outside the regular course or scope of his employment with Oppenheimer. This includes unregistered securities offerings.

83. As Parlor Games' chief financial officer and board member, Lazos engaged in an outside business activity.

15

84. As a FINRA member firm, Oppenheimer had a duty to adequately supervise Lazos concerning his outside business activities. Likewise, Oppenheimer had a duty to adequately supervise Lazos to ensure his compliance with applicable securities laws and regulations.

85. Oppenheimer breached that duty by failing to monitor and supervise Lazos in performance of his outside business activities.

86. By failing to properly supervise Lazos concerning his position with Parlor Games, Oppenheimer facilitated Lazos and the Mak Defendants to defrauded Plaintiff in connection with the purchase and sale of securities. This included: creating a sham $10 million dollar valuation in connection with a securities offering; making materially false and misleading representations concerning the creditability of Parlor Games' sham business valuation by using Oppenheimer's name, reputation, and logo; making false statements concerning the use of investor funds, and concealing the Mak Defendants past and current financial conditions.

87. By reason of the foregoing, Plaintiff has suffered damages in the amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

### Fraud
### (against the Mak Defendants and Lazos)

88. Plaintiff incorporates by reference each and every allegation contained in paragraphs above.

89. As set forth above, the Mak Defendants and Lazos made materially false statements and omissions while soliciting Plaintiff's investment in Parlor Games. This includes, without limitation, Mak concealing his long standing history of soliciting personal loans and failing to satisfy his repayment obligations to the tune of $400,000 dollars, misleading Plaintiff concerning

16

Parlors Games' sham business valuation determined by the company's chief financial officer and Oppenheimer, falsely representing Plaintiff's investment bared "no risk" while simultaneously failing to disclose any potential risk associated with the investment, and falsely representing the use of investor funds when in reality, the Mak Defendants shuttled and commingled Plaintiff's investment through the Mak Entities and for Mak's own personal financial gain.

90. The Mak Defendants knew, or should have known, the falsity of their misrepresentations and/or omissions because, collectively, they possessed exclusive knowledge concerning the Mak Defendants' overall financial condition, business operations, and the risks associated with investing in Parlor Games.

91. By providing these false misrepresentations and omissions, the Mak Defendants and Lazos intended to defraud Plaintiff in connection with his investment.

92. Plaintiff has suffered damages caused by detrimental but reasonable reliance on these false statements and misleading omissions, namely, the loss of his investment.

### FOURTH CLAIM FOR RELIEF

**Breach of Fiduciary Duty**
**(against the Mak Defendants)**

93. Plaintiff incorporates by reference each and every allegation contained in paragraphs above.

94. The Mak Defendants were fiduciaries to Plaintiff with respect to his investment in Parlor Games and by virtue of their superior knowledge concerning the Mak Defendants' business operations and financial condition and, therefore, owed Plaintiff a fiduciary duty.

95. The Mak Defendants breached their fiduciary duty by concealing from Plaintiff that they were operating a Ponzi-like scheme, self-dealing and misusing investor funds.

96. The Mak Defendants' breach of their fiduciary duty was the proximate cause of Plaintiff suffering substantial monetary damages relating to his investment.

**WHEREFORE**, Plaintiff prays for the following relief:

i. Judgment for damages in excess of $250,000 against all Defendants, jointly and severally;

ii. Statutory damages, as applicable, punitive damages, and attorneys' fees as an element of damages and as permitted by law;

iii. Prejudgment interest, attorneys' and expert fees, costs, and disbursements in connection with this action, as permitted by law; and

iv. Such other and further relief as the Court deems just.

Plaintiff reserves the right to amend this Complaint as discovery and investigation proceed, including without limitation to name additional responsible defendants, assert additional causes of action, and demand additional remedies including without limitation additional applicable statutory penalties, punitive damages, and attorneys' fees.

Dated: Uniondale, New York
December 15, 2023

FORCHELLI DEEGAN TERRANA LLP

_____
Anthony C. Varbero, Esq (AV8833)
David C. Casagrande ((DC9838)
avarbero@forchellilaw.com
dcasagrande@forchellilaw.com
avarbero@forchellilaw.com
333 Earle Ovington Boulevard, Suite 1010
Uniondale, New York 11553
Phone: (516) 248-1700
Facsimile: (516) 750-6469